386 So.2d 525 (1980)
Carl Elson SHRINER, Appellant,
v.
STATE of Florida, Appellee.
No. 51749.
Supreme Court of Florida.
May 22, 1980.
Rehearing Denied August 27, 1980.
*527 Daniel T. O'Connell of O'Connell & Hulslander, Gainesville, for appellant.
Jim Smith, Atty. Gen., and A.S. Johnston, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Appellant, Carl Elson Shriner, was convicted of one count of murder in the first degree. The jury recommended and the trial judge imposed a sentence of death. Jurisdiction vests in this Court pursuant to article V, section 3(b)(1), Florida Constitution. We affirm the conviction and sentence.[1]
The following facts came to light at trial. At approximately 1:30 a.m. on Friday, October 22, 1977, two young women entered a Gainesville convenience store (Majik Market). Two other persons were in the store at that time, the store clerk, Judith Carter, and a male customer. The women made their purchases ahead of the male customer and departed. The man was in his midtwenties, of medium height, slender; he had a receding hairline, medium to dark brown collar-length hair, dark eyes, a mustache and a three-to-four-day-old beard.
At 6:15 a.m. the same morning, James Grills went into the Majik Market and discovered the dead body of Judith Carter. He summoned police who arrived at about 6:30 a.m. Gainesville police investigator Mason photographed the scene and recovered three projectiles from the store. Associate district medical examiner Clark later recovered two projectiles from the body.
Alachua County deputy sheriff Denson went on duty Saturday at 3:30 p.m., October 23, 1976, and received a be-on-lookout bulletin (BOLO) with a written description and two composite sketches attached. The description and sketches were based in part on information obtained from the two young women at the Majik Market and on an eyewitness account of an armed robbery which took place early Friday morning at an 8 Days Inn. At 4:00 p.m. that Saturday, deputy Denson stopped opposite a car at a stop sign. The passenger in the car matched the description in the BOLO. Denson stopped the car, advised the passenger of his Miranda[2] rights and asked him *528 some questions. After learning that the passenger had recently been released from prison, Denson took him into custody. The passenger was Carl Shriner.
Upon arrival at the Alachua County sheriff headquarters, detectives readvised appellant of his Miranda rights. Appellant signed in four separate places a form constituting an acknowledgment of understanding of Miranda rights, a waiver of the right to have an attorney present during questioning, a consent to be interviewed and a consent to make a statement. Shriner gave his local address as 1223 Northeast Eighteenth Avenue, where he and Carol Griffis lived at the home of John and Nancy Rapp. John Rapp was the driver of the car in which appellant was apprehended. Shriner had an Arizona driver's license bearing the name Carl Elson Shriner and the address 514 W. Buist, Phoenix, Arizona, and $338 in his wallet.
A gunman robbed the 8 Days Inn in Gainesville at about 3:00 a.m. Friday, October 22, 1976,[3] under the following circumstances. While waiting for the security guard to leave the immediate area, a man asked the clerk for a room and filled out a guest registration form. He robbed the clerk and took the form with him, but not before the clerk had removed two of the five copies. It was signed "Rob E. Williams, 514 W. Buist, Phoenix, Ariz." The motel clerk identified appellant as the culprit in a photo lineup and at trial.[4]
At the sheriff's office appellant signed a written consent to search the portion of the Rapp residence occupied by him. After John and Nancy Rapp consented in writing to a search of the remainder of their home, the police discovered a Smith and Wesson.38 caliber revolver hidden in a chair in the Rapp children's living room. FBI firearms identification expert Bollenbach took possession of the gun and the five projectiles found in the Majik Market and determined conclusively that the projectiles were fired from that gun.[5]
Appellant was taken to the Gainesville Police Department at 7:30 p.m., Saturday, October 23, 1976. He signed a waiver and consent form after being readvised of his Miranda rights. Numerous law enforcement officers and an assistant state attorney participated in the ensuing interrogation, which continued from 9:00 p.m. until 2:45 a.m. the following morning. Appellant first offered to Sergeant Blitch a number of inconsistent accounts of his knowledge of the murder and confessed only to the 8 Days Inn robbery. At approximately 1:00 a.m. Sunday, October 24, 1976, during questioning by assistant state attorney Nilon and with Blitch out of the room, Shriner made some equivocal statements evincing an apparent desire to terminate questioning about the 8 Days Inn robbery.[6] Nilon proceeded to other subjects and the interrogation continued. At 2:00 a.m., with Sergeant Blitch present, appellant confessed to the murder of Judith Carter.
Appellant presents a plethora of issues for our consideration, several of which do not merit discussion. His first colorable contention is that his arrest was illegal because of a lack of probable cause. We disagree. A law enforcement officer has probable cause to arrest if he has reasonable grounds to believe that the person arrested has committed a felony. State v. Outten, 206 So.2d 392, 397 (Fla. 1968). The facts constituting probable cause need not meet the standard of conclusiveness and probability required of the circumstantial facts upon which a conviction must be based. Id. Here, the sketches attached to the police BOLO bore a striking resemblance to appellant, thus furnishing deputy Denson with reasonable grounds to believe that appellant had committed the robberies.
Of considerably greater difficulty is whether, although otherwise voluntary, Shriner's confession must be suppressed because *529 of his claim that the police persisted in questioning him after he indicated an unwillingness to answer questions on a particular subject. Appellant relies upon the following language in Miranda v. Arizona, 384 U.S. 436, 473-74, 86 S.Ct. 1602, 1627-1628, 16 L.Ed.2d 694:
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. [Footnote omitted.]
Miranda required exclusion of any statements stemming from custodial interrogation unless the prosecution demonstrated compliance with its specific prophylactic safeguards.[7] If law enforcement officers fail to give the specified warnings before interrogation or fail to follow the Miranda guidelines during interrogation, the statement thus derived may be suppressed, even though otherwise "wholly voluntary." Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).
In Michigan v. Mosley, police questioning was held proper even though the accused had earlier indicated his desire to remain silent. The Supreme Court rejected a strict rule which would totally preclude all further custodial interrogation.[8] At the same time it observed that to construe Miranda to require only a pause in questioning, with a resumption of interrogation after only a momentary respite, would effectively undermine the will of the accused:
Clearly, therefore, neither this passage nor any other passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.
A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt "fully effective means .. . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored ..." 384 U.S., at 479, 86 S.Ct. at 1630. The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Id., at 474, 86 S.Ct. at 1627. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his "right to cut off questioning" was "scrupulously honored."
423 U.S. at 102-04, 96 S.Ct. at 326 (Footnotes omitted).
Turning to the facts here, it appears that during interrogation by assistant state attorney James Nilon, Shriner indicated a desire to stop talking about the 8 Days Inn robbery. At the hearing on the motion to suppress Nilon described the episode in this way:

Direction Examination:
Q. During any of that period of time that you were in his presence did he ever ask to have an attorney present?
A. No, sir, he did not.

*530 Q. Did he ever ask to stop talking or remain silent?
A. Yes, to a certain extent. What he did, in the first conversation that I had with him after Investigator Blitch had left the room, particularly in reference to the 8 Days Inn robbery, he told me certain things that had happened in the 8 Days Inn robbery and when I asked him particularly about the gun that he used in the 8 Days Inn robbery he said to me something to the effect, "Well, right now it's like I'm crazy. It's like I'm nuts." I said, "Well, Mr. Shriner ..." I don't remember what I said, but I said, "It's not like you mean you are insane." He said, "No." I said, "You mean you don't want to answer any more questions?" And he said, "Yes." I just sat there for a minute. I think at that point I asked him something about his family background and he answered that, and that's the only time I can think of he even alluded to the fact that he didn't want to answer any questions or make any further statements or anything.
TH 100-101.

Cross-Examination:
Q. All right. Let me go back to one of the statements that Mr. Shriner is giving  and it was kind of at the end of Mr. Hebert's direct examination  you said that during one of the times you were talking to Mr. Shriner concerning the weapon or the gun, he made the statement to you something about, "I'm crazy" or "Stop. I'm crazy."
A. Yes, sir.
Q. Kind of vague. We are not sure as to the terminology that was used. The word crazy was used, though.
A. Crazy or nuts. It's like I'm crazy or nuts." And I interpreted that to mean, "It's like I'm not really nuts, but for your sake and, you know, in answering these questions, further questions, it's like I'm nuts to you."
Q. Was he saying he was just getting confused or tired?
A. My impression was that he was saying, like, from now on out as far as concerning the gun and specifics of the 8 Days Inn robbery, it was like he was insane, that, you know, the answers would be like a crazy man. I got the impression he was saying, "Don't bother asking me any more questions about that."
Q. I believe you said on direct examination  did he say, "I don't want to answer any more questions"?
A. He never told me specifically like, "I don't want to answer any more questions," that I can remember.
Q. Did you get the impression he didn't want to answer any more questions?
A. About that part of the incident, yes, about the 8 Days Inn and where he got the gun and things of that nature and any more specifics, yes, but then we sat there for a minute or two and I asked him some other questions. I think it was about his personal ...
Q. About his family and personal things.
A. Yes, and he just answered and we started another conversation and he had no problem.
TH 107-108.
At trial Mr. Nilon offered this account:

Cross-Examination:
Q. At the point in time that you are talking to him now concerning the Eight Days Inn, I believe there was a little incident that took place, and you are talking to Mr. Shriner, and I believe that Mr. Shriner seemed to indicate to you that he did not want to talk, he was having problems. My understanding is did he use the words "I am crazy" or "I am having problems". Do you remember the thing that I am talking about?
A. Yes, I do.

*531 Q. Okay. There was some problem at this point in time, was there not, in the interview room, that existed between Mr. Shriner and yourself as to this interrogation?
A. I don't know what you mean by a problem. There was a point in time that he made some of the statement that you are talking about.
Q. Can you be more specific about that, please?
A. Yes, I can. I had gotten some information from one of the investigators, and I can't tell you which one because there were a number of them, prior to going into the room concerning a piece of paper, I think it was a registration that the person who had committed the robbery had signed before he or as he was pulling the robbery giving an Arizona address.
I started questioning Mr. Shriner about signing the registration and did he sign his address or his parents' address, and he, I don't want to say smile, but he had kind of a smirk or a grin on his face and said that "I am crazy." I said, "Do you mean by that that you are actually, you know, out of your mind or crazy?" And I don't remember whether he answered that or not.
I said, "Well you mean you don't want to answer any more questions about that?" And he said, "Yeah."
Q. Okay. But there was some problem at this point in time, he did not want to talk about it?
MR. HEBERT [state attorney]: The State objects, Your Honor. The words speak for themselves. What counsel calls a problem, the witness has already said that he doesn't know what that means but he is telling what happened.
MR. KEARNS [defense counsel]: I will rephrase the question, Your Honor.
THE COURT: The objection is moot by the question being withdrawn.
BY MR. KEARNS:
Q. He did not want to talk about that particular area, did he?
A. No, he did not.
Q. Now, based upon that response, did you inquire as to whether or not he wished to continue?
A. No, sir. At that point in time there was about a minute or two lull or lapse and that is when I started talking about personal things.
Q. Okay. Then you started going on about this personal family things?
A. Yes. At that point in time, during those conversations, I really terminated conversations about any offenses.
TT 720-722.

Redirect Examination:
Q. Now, you mentioned that he mentioned to you that he didn't want to talk about it, he gave you an impression that he didn't want to talk about the specifics of the folio. Did he have any objections about going on and talking about other things?
A. Specific  I am sorry, I didn't understand.
Q. All right. Mr. Kearns talked about the thing called problems sometime 
A. Yes.
Q.  where the defendant said or you asked him about the folio, signing it, and he said, "I am nuts," and you said, "You just don't want to talk about it any more." You didn't talk to him any more about the folio; is that correct?
A. No, I dropped that subject.
Q. Okay. Did he have any problem talking about anything else?
A. No, sir.
Q. Did he ever say that he didn't want to talk about anything else?
A. No, sir.
Q. Did he freely and voluntarily answer other questions that you asked him?

*532 A. Yes, sir. As I stated before, there was about a minute or two lull period where we just sat there and I said  well, I might have started something like, "Carl, where are you from?" And then we started about personal matters that I have already testified to.
Q. All right. Now, during that time when he was making the admissions of guilt to you, "I shot her, why I shot her," did he ever stop or tell you that he wanted to stop talking about it?
A. No, sir.
Q. Or that he wanted a lawyer?
A. No, sir.
TT 727-28.
Appellant testified in his own behalf at the motion to suppress but made no mention of any desire to terminate questioning.
We are satisfied that, based on Mr. Nilon's testimony and the absence of rebuttal evidence to the contrary, the trial judge correctly concluded that appellant wanted to terminate questioning only insofar as it related to the 8 Days Inn robbery. We are similarly satisfied that Mr. Nilon respected appellant's partial exercise of his Miranda privilege and restricted further questioning to other areas. Given this posture, the police did not run afoul of Miranda and Mosley by continuing the interrogation:
When a person in custody has responded to proper police interrogation by voicing a general willingness to talk, subject only to a limited desire for silence, and his wishes not to discuss a particular subject-matter area are respected, nothing rooted in law or constitutional policy makes it improper to question him as to any unlimited subjects.[9]
United States v. Vasquez, 476 F.2d 730, 732-33 (5th Cir.1973); accord, Smith v. United States, 505 F.2d 824 (6th Cir.1974); United States v. Matthews, 417 F. Supp. 813 (E.D.Pa.), aff'd., 547 F.2d 1165 (3d Cir.1976), cert. denied, 429 U.S. 1111, 97 S.Ct. 1148, 51 L.Ed.2d 565 (1977).
Hence, appellant's confession was properly admitted at trial.
Appellant next asserts error in the admission of evidence relating to the 8 Days Inn robbery. He properly cites Williams v. State, 117 So.2d 473 (Fla. 1960), for the proposition that evidence of other crimes is inadmissible if offered solely for the purpose of showing bad character or propensity. However, Williams does permit evidence of other crimes
if it casts light on the character of the act under investigation by showing either motive, intent, absence of mistake, common scheme, identity or a system or general pattern of criminality so that the evidence of such other crimes would have a relevant or material bearing upon some essential aspect of the offense then being tried.
Ashley v. State, 265 So.2d 685, 693 (Fla. 1972).
Relevancy is the test; if the proffered evidence is relevant for any purpose other than to show bad character or propensity, it should be admitted. Id.
We concur in the trial judge's ruling that evidence of the 8 Days Inn robbery was admissible to prove identity. The following facts adduced at trial make apparent the relevancy of this evidence: (1) police found a .38 caliber gun and cartridges *533 in appellant's residence;[10] (2) ballistics expert Bollenbach identified the gun found in appellant's residence as the murder weapon;[11] (3) at 3:00 a.m., only ninety minutes after Judith Carter's murder, a man robbed the 8 Days Inn. The hotel clerk identified appellant as the culprit and testified that the gun used in the robbery closely resembled the murder weapon.[12] Thus, the evidence of the 8 Days Inn robbery, if believed by the jury, places the murder weapon in the hands of appellant within ninety minutes of Judith Carter's demise. Such evidence is clearly probative of the murderer's identity.
The remaining issues involve the sentencing phase of the trial. Appellant's constitutional attack on the death penalty has been thoroughly canvassed in prior decisions and found groundless. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Alford v. State, 307 So.2d 433 (Fla. 1975), cert. denied, 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976); State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Equally meritless is the contention that it was error to exclude the testimony of a priest who had witnessed an execution by electrocution. While it is settled that an advisory jury and trial judge may consider evidence of mitigating factors beyond those enumerated in section 921.141(6), Florida Statutes (1977),[13] the evidence must be relevant to the sentencing inquiry. We do not believe that a descriptive account of an electrocution would aid the jury or judge in their effort to apply section 921.141 fairly and correctly. Indeed, such evidence would more likely serve to distort and obfuscate the sentencing process.
Appellant contends finally that his death sentence is fatally defective because the judge considered nonstatutory aggravating circumstances. The relevant portions of the judge's findings are as follows:
The question occurs as to whether death or life imprisonment should be the verdict of this Court. Using the statutory guidelines of mitigating circumstances as opposed to aggravating circumstances, the Court finds under aggravating circumstances the following:
1. Whether the Defendant was under sentence of imprisonment when he committed the murder for which he was convicted. This case does not fit this guideline.
2. Whether the Defendant has previously been convicted of another capital felony or of a felony involving the use of or threat of violence to the person.
The Defendant CARL ELSON SHRINER was convicted of the offense of Armed Robbery in Dade County in 1972. He served a five-year sentence in the Department of Offender Rehabilitation for this act.
3. Whether in committing the murder for which he has just been convicted, the Defendant knowingly created a great risk of death to many persons. This guideline is not applicable to this case.
4. Whether the murder for which the Defendant was convicted was committed while he was engaged in the commission of or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, aircraft piracy or the unlawful throwing, placing or discharging of a destructive bomb or device.
The evidence shows in this case that the Defendant killed Judith Ann Carter while perpetrating robbery.
The following are statutory mitigating circumstances which have been considered:
1. Whether the Defendant has no significant history of prior criminal activity.

*534 2. Whether the murder was committed while Defendant was under the influence of extreme mental or emotional disturbance.
3. Whether the victim was a participant in the Defendant's conduct or consented to the acts.
4. Whether the Defendant was an accomplice in the murder committed by another person and the Defendant's participation was relatively minor.
5. Whether the Defendant acted under extreme duress or under the substantial domination of another person.
6. Whether the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
7. The age of the Defendant at the time of the crime.
The Court finds, with the possible exception of No. 6 above, there are no mitigating circumstances in this case. An examination of the psychiatric evaluation in this case, found both in the presentence investigation from the Department of Offender Rehabilitation and by the various psychiatrists appointed to represent this Defendant prior to trial, he has been diagnosed as a "sociopathic personality". An examination of these reports, however, does not lead one to the conclusion that his capacity is diminished thereby.
The Court finds that the aggravating circumstances far outweigh the mitigating circumstances.
In addition, an examination of the presentence investigation, which was made available in its entirety, including the confidential section, to the attorney for the Defendant prior to sentencing, indicates that during the Defendant's incarceration at the Department of Offender Rehabilitation, he has presented a discipline problem and to some degree a security risk. The investigation further shows that he has engaged in a long pattern of violent criminal conduct. In addition, it is apparent that the robbery that was committed in perpetration of the death of Judith Ann Carter was not the sole robbery committed by this Defendant subsequent to his release from prison some three weeks prior to the date of the offense.
As a preliminary matter, the record is replete with evidence to support the judge's finding of aggravating circumstances numbered two and four.[14] The record also supports the finding of no mitigating circumstances. It is not clear, however, whether the judge considered appellant's disciplinary record as an aggravating circumstance. Even if we assume that the disciplinary problem was so treated, the error was harmless. We have here two valid aggravating circumstances counterbalanced by no mitigating circumstances. Since death is presumed in this situation,[15] improper consideration of a nonstatutory factor does not render the sentence invalid:
It appears that the United States Supreme Court does not fault a death sentence predicated in part upon nonstatutory aggravating factors where there are no mitigating circumstances. The absence of mitigating circumstances becomes important, because, so long as there are some statutory aggravating circumstances, there is no danger that nonstatutory circumstances have served to overcome the mitigating circumstances in the weighing process which is dictated by our statute.
Elledge v. State, 346 So.2d 998, 1002-03 (Fla. 1977) (emphasis in original).
Accordingly, the judgment of guilt and the sentence of death are affirmed.
It is so ordered.
ENGLAND, C.J., and ADKINS, BOYD, OVERTON, SUNDBERG and ALDERMAN, JJ., concur.
NOTES
[1] References to specific pages in the record will be designated as follows: record on appeal, R; supplemental record on appeal, SR; Trial transcript, TT; red-bound transcript of 2/3/77 hearing, TH.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] TT 641.
[4] TT 651, 655.
[5] TT 636.
[6] The facts surrounding this episode will be fully explored later in this opinion.
[7] United States v. Charlton, 565 F.2d 86, 89 (6th Cir.1977), cert. denied, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773 (1978).
[8] Id.
[9] We also concur with the Circuit Court's footnote # 2 to the above statement, 476 F.2d at 733:

We certainly do not intimate approval of any practice by which a suspect's express desire to remain silent as to some specific activity is aborted by the subterfuge of questioning which is designed or intended to indirectly gain information about those matters which he has indicated he wishes not to discuss. However, this record is bare of any perfidious police practices. And considering the lack of contradictory evidence in Shriner's testimony at the motion to suppress, we would be irresponsible to overturn the trial judge's finding of voluntariness. See Cooper v. State, 336 So.2d 1133 (Fla. 1976), cert. denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977).
[10] TT 611.
[11] TT 636.
[12] TT 641-56.
[13] See Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Proffitt v. Florida, supra; Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).
[14] § 921.141(5)(b) and (d), Fla. Stat. (1977).
[15] "When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances... ." State v. Dixon, 283 So.2d at 9.