GROSS, J.
Charles Dixon appeals his convictions for armed burglary of a dwelling, burglary of a dwelling, grand theft with a firearm, and grand theft; all charges arise from two incidents at his parents’ house. Dixon was arrested for an unrelated theft at a Home Depot. The resulting interrogation covered both that theft and the home burglaries. Dixon confessed to the Home Depot theft and, eventually, to the home burglaries. In a motion to suppress, Dixon argued that he unequivocally invoked the right to remain silent as to the home burglaries, and that the police did not honor his right. We hold that Dixon properly invoked his right to remain silent on the home burglaries; the detectives did not scrupulously honor that invocation. The trial court’s refusal to suppress the resulting confession, and its subsequent admission into evidence at trial, was harmful error.

Facts

Dixon was arrested after a burglary at a Home Depot. He was questioned by Detective Lawrence, the lead detective in the Home Depot investigation, and Detective Roque, the lead detective in the home burglaries investigation. At the time of his arrest, Dixon was a suspect in the burglaries at his parents’ home.
At the beginning of the interrogation, the detectives introduced themselves and asked Dixon, “Charlie, where are you staying at these days? Where you sleeping? When’s the last time your mom and dad *173 talked to you? When’s the last time you saw them, today?” Dixon replied, “Today, yesterday.” After the detectives asked if Dixon was sure, Dixon said, “... I would appreciate if we not talk about what my mom and dad.” One of the detectives relayed that his parents were concerned about him. Dixon responded, “I already at this point don’t wanna hear what they have to say, be honest with you.”
The detectives then read Dixon his Miranda[1] rights, which he waived. They first talked to Dixon about the Home Depot burglary. Following the conversation on the Home Depot incident, the detectives moved on to question Dixon about the burglaries of his parents’ home, informing him that they had talked to his brother and his mother. They asked, “What did you do with the stuff you took out of the house?” Dixon initially responded, “I didn’t do nothing with it.”
The detectives followed up: “You didn’t do anything with it?” Dixon answered, “I did, that conversation, that dead [sic] about that house. I tried to explain to my brother and everybody else, that’s dead on. I don’t want to talk about that.” The detectives then asked, “Hang on a second, what did you try [to] explain to your brother?” Dixon replied:
I tried to explain to my brother when I called him and told him, I called, two people called me at the house and he won’t even call my mother. They were in South Carolina, I said, call mama, coming out the back window. He act like he didn’t even wanna, he ain’t have nothing to say from that point on there, I don’t want to talk about that, period, whatever happened, happened.
The detectives asked further questions about the burglaries, and then asked, ‘You love your mama, don’t you?” Dixon answered, “I don’t know who I love no more because this conversation here about this house thing is through, I don’t wanna talk about that, period.” The detectives queried, “Why is it through?” Dixon replied, “Because why should I talk to ya’ll about it when, when it first occurred, when I talked to my brother about it and he was gonna do something about it.”
The detectives told Dixon that he should not be angry with them, and he said that he was not, but he seemed upset, saying:
Nobody did nothing about it. They point the finger at me so you wanna point the finger at me. I’m gonna tell you the truth, I, I don’t want anything to do with this here what you talking about what did I do. You see, what did I do with the stuff that I took out the house? So therefore you saying that I broke into the house, somewhere I broke into the house and I broke in the house, I don’t want to go through that.
The detectives’ next question was, “So why did you break into your mom’s house, dude? I mean, you need money, right? Wfiiy did you do it?” Dixon replied, “I’m not gonna answer that.” When the detectives asked Dixon why, he said, “Because I don’t know.” “Because it’s your mom’s house?” the detectives asked. Dixon answered, “I don’t want to talk about that.”
The detectives continued to question Dixon about the burglaries. They asked, “So you would never take anything from your parents, is that what you’re saying?” Dixon said, ‘Yeah, I ain’t talking about that there.” The detectives said, “Listen, this is your family.” Dixon said, ‘Yeah, I ran, we through talking about that.” The detectives persisted in their interrogation about the burglary, eventually resulting in this exchange:
*174 A. I’m gonna say this here, look at this here, I’m gonna say this right here, I ain’t trying to disrespectful to neither one of ya’ll, I’m a man just like ya’ll a man. Now enough is enough, you know what I’m saying, enough is enough. Now, I don’t want to talk about that house no more. Now whatever ya’ll need to do to find out who did this, because you asking me the same question that he’s asking me.
Q. I’m not talking about the house.
A: Because it’s irrelevant, you know what I’m saying? Let’s not talk about the house.
Dixon’s story was that he had witnessed one of the burglaries from across the street, so the detectives focused on why Dixon was there at the time. The detectives acknowledged that they understood that Dixon did not want to talk about the house: “So hear me out, since you don’t want to talk about the house I’ll talk about the house, so you just hear me out, I’m not gonna ask you any questions.” The detectives later went over Dixon’s story and told him they did not believe it. Dixon said, “I don’t want to talk about it no more.” The detectives responded, “Of course.” Dixon continued, “I don’t want to talk about it no more, you know what I’m saying? I feel like — .” The detectives interrupted and the interrogation continued.
Dixon eventually confessed to the burglaries. He said that he had someone else go into the house and told them where to go once inside it. Dixon admitted to taking his parents’ wedding bands, a shotgun, lawnmowers, an air compressor, a TV, a DVD player, and a stereo; he indicated he had sold them, but could recover the items if he paid the buyers around $300.
Arguing for suppression of his statements about the house, Dixon contended that his declarations that he did not want to talk further about the house and his family constituted unequivocal invocations of his right to remain silent on the burglaries of his parents’ house; he argued that he could partially or selectively invoke the right to remain silent about certain subjects, citing Shriner v. State, 386 So.2d 525 (Fla.1980). Because the detectives did not thereafter cease questioning him on the subject of those burglaries, Dixon argued his subsequent confession should be suppressed.
The trial court denied Dixon’s motion. The court first determined that Dixon’s initial waiver of his Miranda rights was free, voluntary, and intelligent. It determined that the later, purported invocations were not unequivocal invocations of the right to remain silent, but were mere deflections from questions on a certain subject, presumably the burglaries. The court disagreed with Dixon’s reliance on Shriner, opining that “[a] partial or selective invocation of the right to remain silent is not an unequivocal invocation of one’s right to silence.” The court wrote, “The right to remain silent is just that — a right to remain silent, not a right to remain partially silent.” (Emphasis in original.)

Standard of Review

A trial court’s ruling on a motion to suppress is presumed correct, and on appeal, the evidence from the suppression hearing must be interpreted in a manner most favorable to sustaining the court’s ruling. See State v. Allen, 994 So.2d 1192, 1194 (Fla. 5th DCA 2008). The ruling is a mixed question of fact and law. Hines v. State, 737 So.2d 1182, 1184 (Fla. 1st DCA 1999). “[Mjixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue.” Con- *175 nor v. State, 803 So.2d 598, 605 (Fla.2001) (citing, inter alia, United States v. Bajakajian, 524 U.S. 321, 337 n. 10, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998)).

Analysis

“Both the United States and Florida Constitutions provide that persons shall not be ‘compelled’ to be witnesses against themselves in any criminal matter.” Ross v. State, 45 So.3d 403, 412 (Fla.2010) (citing U.S. Const, amend. V; art. I, § 9, Fla. Const), cert. denied, — U.S. -, 131 S.Ct. 925, 178 L.Ed.2d 803 (2011). To give effect to the Fifth Amendment right against self-incrimination, an accused person has the right to remain silent. Miranda v. Arizona, 384 U.S. 436, 467-69, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). “[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his ‘right to cut off questioning’ was ‘scrupulously honored.’ ” Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (footnote omitted) (quoting Miranda).
To invoke this right during an interrogation, i.e., after an initial waiver of the Miranda rights, the accused must do so unequivocally and unambiguously. See Berghuis v. Thompkins, — U.S. -, -, 130 S.Ct. 2250, 2259-60, 176 L.Ed.2d 1098 (2010); State v. Owen (Owen II), 696 So.2d 715, 717-18 (Fla.1997). If the accused’s attempt to invoke the right is equivocal or ambiguous, police do not have to cease questioning or even clarify the accused’s statement. See Thompkins, 130 S.Ct. at 2259-60.; cf. Davis v. United States, 512 U.S. 452, 458-59, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (“[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.” (emphasis in original) (citations omitted)).
This case is controlled by Pierre v. State, 22 So.3d 759 (Fla. 4th DCA 2009). There, when confronted with the accusations against him, the defendant said, “Did what, what are you talking, I didn’t take nothing. You tripping, man, I didn’t say nothing. I was nowhere near them guys. I wasn’t with nobody, I was with my cousin waiting on my baby momma, that’s where I was, 33rd and Kentucky. I’m not saying anymore.” Id. at 766 (emphasis in opinion). The defendant and the detective sat silent for nearly a minute before another detective entered the interrogation room and insinuated that the defendant had been identified as one of the perpetrators. Id. at 766-67. In the middle of the ensuing exchange, during which the defendant confessed his involvement, the defendant said, “I’m not talking anymore.” Id. at 767. The interrogation then ended. Id.
Examining the totality of the circumstances, we held that the defendant’s first statement was an unequivocal invocation of the right to remain silent. Id. at 767-68. We articulated this legal framework:
Generally, “if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop.” Cuervo [v. State], 967 So.2d [155,] 161 [(Fla.2007) ] (quoting Traylor v. State, 596 So.2d 957, 966 (Fla.1992)). The phrase “in any manner” simply means that there are no magic words that a suspect must use to invoke his rights. State v. Owen [Owen II], 696 So.2d 715, 719 (Fla.1997). “[0]nce a defendant waives his or her right to remain silent, subsequent equivocal requests to terminate an interrogation do not automatically re *176 quire police to cut off all questioning.” Cuervo, 967 So.2d at 161. “A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.” Owen [II], 696 So.2d at 718. “[A] determination of the issues of both the voluntariness of a confession and a knowing and intelligent waiver of Miranda rights requires an examination of the totality of the circumstances.” Lukehart v. State, 776 So.2d 906, 917 (Fla.2000).
Id. at 767.
Pierre explained that the defendant’s statement and the subsequent near minute of silence, during which the detective in the room also was quiet and discontinued questioning, meant that the detective, “as a reasonable police officer, ... understood Pierre’s statement to be a demand that questioning cease.” Id. at 768-69. Because the detectives also did not scrupulously honor the defendant’s invocation, this court reversed the trial court’s denial of his motion to suppress. Id. at 769-72.
The circumstances of this case demonstrate that the defendant unequivocally invoked his right to remain silent on the issue of the home burglaries. In response to questions about the burglaries, Dixon said: “I don’t want to talk about that”; “[T]his conversation here about this house thing is through, I don’t wanna talk about that, period”; “I don’t want anything to do with this here what you talking about what did I do.... I don’t want to go through that”; “Yeah, I ain’t talking about that there”; “Now enough is enough, you know what I’m saying, enough is enough. Now, I don’t want to talk about that house no more”; “Let’s not talk about the house”; and “I don’t want to talk about it no more”. Unlike Owen v. State (Owen I), 560 So.2d 207 (Fla.1990), upon which the state relies, this case lacks the repeated, defendant-initiated interrogations, as well as statements that could be construed as refusals to answer only a few specific questions. Unlike the defendant in Owen, Dixon’s declarations referred to questioning about the “house thing” in general, and cannot be construed as responses directed only to the specific subject matter of the question. Further, the things to which Dixon was responding were not insignificant questions, but questions about why he broke into his parents’ house and how he disposed of what was taken, an appeal to his love for his mother, and the detectives’ recitation of Dixon’s story followed by their expression of disbelief.
As it was with the defendant in Pierre, it is clear from the context that Dixon was demanding that questioning on the home burglaries cease.[2] Indeed, one of the detectives belied his understanding that Dixon did not want to talk about the home burglaries when he said: “So hear me out, since you don’t want to talk about the house I’ll talk about the house, so you just hear me out, I’m not gonna ask you any questions.” More than the silence of the police officer in Pierre, this statement demonstrates an understanding that Dixon wanted questioning about the home burglaries to cease. Because the detectives in this case did not cease questioning Dixon, they did not scrupulously honor his invocation of the right to remain silent. Cf. Mosley, 423 U.S. at 105-06, 96 S.Ct. 321 *177 (holding that the police scrupulously honored a defendant’s right to cut off questioning when they “immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of [Miranda] warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation”).
Since Dixon unequivocally expressed his desire to stop questioning on the home burglaries, but not the Home Depot theft, the next question is whether Florida law allowed Dixon to invoke that right on only that subject; the trial court determined he could not.
We disagree with the trial court and conclude that Shriner v. State, 386 So.2d 525 (Fla.1980), allows a defendant to assert a right to remain silent regarding certain matters, but not others. There, the defendant was arrested for a murder committed at a Majik Market in Gainesville. See id. at 527-28. Shortly after the murder, a gunman robbed an 8 Days Inn in Gaines-ville. Id. at 528. Evidence at the motel, including ballistic evidence, connected the defendant to the robbery; additionally, the motel clerk identified the defendant in a photo lineup. See id.
After his arrest, the defendant waived his Miranda rights, making “a number of inconsistent accounts of his knowledge of the murder and confessed only to the 8 Days Inn robbery.” Id. Late in the interrogation, the defendant “made some equivocal [3]] statements evincing an apparent desire to terminate questioning about the 8 Days Inn robbery.” Id. Specifically, in response to an interrogator-prosecutor’s question “You mean you don’t want to answer any more questions?” about the 8 Days Inn robbery, the defendant answered, “Yes.” Id. at 530, 86 S.Ct. 1602. As the prosecutor testified at the suppression hearing, he understood the defendant to mean “Don’t bother asking me any more questions about that.” Id. The prosecutor then asked him questions wholly unrelated to the 8 Days Inn robbery before the defendant eventually confessed to the Majik Market murder. Id. at 528, 530, 86 S.Ct. 1602.
Confronting the Supreme Court was the issue of “whether, although otherwise voluntary, [the defendant’s] confession must be suppressed because of his claim that the police persisted in questioning him after he indicated an unwillingness to answer questions on a particular subject.” Id. at 528-29, 86 S.Ct. 1602. After quoting extensively from Mosley, the court noted that the defendant “indicated a desire to stop talking about the 8 Days Inn robbery.” Id. at 529. It continued:
*178 We are satisfied that, based on [the prosecutor] Mr.. Nilon’s testimony and the absence of rebuttal evidence to the contrary, the trial judge correctly concluded that appellant wanted to terminate questioning only insofar as it related to the 8 Days Inn robbery. We are similarly satisfied that Mr. Nilon respected appellant’s partial exercise of his Miranda privilege and restricted further questioning to other areas. Given this posture, the police did not run afoul of Miranda and Mosley by continuing the interrogation:
When a person in custody has responded to proper police interrogation by voicing a general willingness to talk, subject only to a limited desire for silence, and his wishes not to discuss a particular subject-matter area are respected, nothing rooted in law or constitutional policy makes it improper to question him as to any unlimited subjects.
United States v. Vasquez, 476 F.2d 730, 732-33 (5th Cir.1973); accord, Smith v. United, States, 505 F.2d 824 (6th Cir.1974); United States v. Matthews, 417 F.Supp. 813 (E.D.Pa.), aff'd., 547 F.2d 1165 (3d Cir.1976), cert. denied, 429 U.S. 1111, 97 S.Ct. 1148, 51 L.Ed.2d 565 (1977).
Id. at 532 (footnote omitted). Hence, appellant’s confession was properly admitted at trial.
Shriner implicitly recognized that a defendant can invoke the right to remain silent on specific subjects. Basic Fifth Amendment policy supports this principle. A contrary rule would allow police to persist in their questioning of defendants who do not wish to discuss certain crimes, and to do so in the coercive environment of a custodial interrogation. Such an outcome would encourage police to hold wide-ranging interrogations of such defendants, thereby subjecting them to a self-incrimination from which they could not escape. This is the precise evil the right to silence — rooted in the Fifth Amendment right against compelled self-inerimination — is designed to avoid. See Mosley, 423 U.S. at 104, 96 S.Ct. 321 (“The requirement that law enforcement authorities must respect a person’s exercise of that option [to remain silent] counteracts the coercive pressures of the custodial setting.”).
One of the reasons that the trial court did not follow Shriner was because it concluded that the decision was outdated in light of certain developments in Fifth Amendment law. However, nothing in Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), and Owen II, 696 So.2d 715, undermines Shriner. Davis and Owen II dealt with the constitutional effect of equivocal or ambiguous invocations of Miranda rights, not whether a defendant could invoke rights only as to certain topics.[4] Under these cases, and in light of Shriner, if an accused clearly expresses his desire not to be questioned about a specific subject, questioning may continue, so long as it does not cover the subject matter about which the right to remain silent was asserted.
*179 Under Shriner, Dixon could invoke his right to remain silent on the home burglaries, and he did so. The trial court’s error in denying Dixon’s motion to suppress was harmful. Like other errors, the erroneous admission of a confession obtained in violation of Miranda is subject to harmless error analysis. See Ross, 45 So.3d at 434. “The harmless error test ... places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986) (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
Here, the heart of the state’s case was Dixon’s confession to both burglaries and thefts. The state could not prove that Dixon committed the first burglary and theft without the confession. And the confession was the strongest evidence connecting Dixon to the second burglary. There is a reasonable possibility that the confession contributed to the convictions. We reverse the convictions and suppress that portion of the interrogation beginning with the exchange set forth in footnote 2.

Reversed and remanded for a new trial.

STEVENSON, J., and STREITFELD, JEFFREY E., Associate Judge, concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. To some extent, Dixon's assertion of his right was equivocal; that doubt ended with the exchange when the detectives asked "You love your mama, don’t you?,” and Dixon responded, "I don’t know who I love no more because this conversation here about this house thing is through, I don’t wanna talk about that, period.”

. Decided in 1980, Shriner predates the United States Supreme Court cases in which “equivocal” became a term of art for Fifth Amendment cases. See Edwards v. Arizona, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (suggesting that a defendant must "clearly assertf] his right to counsel”); Smith v. Illinois, 469 U.S. 91, 95-96 & n. 3, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (noting that "an accused's asserted request for counsel may be ambiguous or equivocal,” but not resolving the conflicts developed among lower courts “for determining the consequences of such ambiguities” (citations omitted)); Connecticut v. Barrett, 479 U.S. 523, 529-30, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (noting that "[(Interpretation is only required where the defendant’s words ... are ambiguous,” but holding that the defendant “made clear his intentions” that he wanted counsel); Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that police do not need to stop questioning "if a suspect makes a reference to an attorney that is ambiguous or equivocal”).
Arguably, the Florida Supreme Court did not conclude that the Shriner defendant’s statements were equivocal in the Fifth Amendment sense.

. To the extent the trial court believed the statement on ineffective, partial invocations in Owen II, 696 So.2d at 718 n.5, bore on the Shriner issue before it, we note that the Supreme Court has declared that
this Court does not intentionally overrule itself sub silentio. Where a court encounters an express holding from this Court on a specific issue and a subsequent contrary dicta statement on the same specific issue, the court is to apply our express holding in the former decision until such time as this Court recedes from the express holding.
Puryear v. State, 810 So.2d 901, 905 (Fla.2002).