# Third District Court of Appeal

## State of Florida

Opinion filed June 2, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-875
Lower Tribunal No. F05-16085
_____

**Derrick Holmes,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Veronica Diaz, Judge.

Rier/Jordan, P.A., and Andrew F. Rier and Jonathan E. Jordan, for appellant.

Ashley Moody, Attorney General, and Richard L. Polin, Assistant Attorney General, for appellee.

Before FERNANDEZ, SCALES, and HENDON, JJ.

HENDON, J.

Derrick Holmes appeals from his conviction and sentence for first-degree murder while carrying, using, displaying, or threatening to use a knife. For the reasons that follow, we affirm.

Holmes was charged by an amended indictment with first-degree premeditated murder and/or felony murder while carrying, using, displaying, or threatening to use a knife (Count I); armed burglary (Count II); and grand theft (Count III), which offenses occurred on or about May 10, 2005. Count three was nolle prossed prior to the commencement of trial and Count II was nolle prossed during the trial.

Prior to trial, Holmes filed a motion to suppress his entire confession ("Motion to Suppress"), raising arguments not pertinent to this appeal. Detective Stroze, who was the detective in charge of the homicide investigation, testified in a deposition and at the evidentiary hearing on the Motion to Suppress. His testimonies reflect as follows. On May 12, 2005, the victim's neighbor called the police because she last saw the victim on May 10, 2005 at approximately 8:30 p.m. About half an hour later, she noticed that the victim's car was missing. When a police officer arrived at the victim's home, the front door was locked and there was no sign of forced entry. The police officer entered through a window and found the victim in a hallway with stab wounds. It was later determined that bloody

fingerprints discovered at the victim's home matched Holmes' fingerprints.

On May 18, 2005, while a search warrant for Holmes' residence was being executed, Detective Stroze and Detective Parr went to the facility where Holmes had been in custody since May 12, 2005 for two robberies—one on May 11, 2005, and the other on May 12, 2005. Detective Stroze explained to Holmes that he wanted him to come to the police headquarters because he was investigating an unsolved crime. Holmes asked if it was for a homicide and, in response, Detective Stroze said that he was investigating an unsolved robbery of a woman. Holmes told Detective Stroze that he was not involved with that robbery and agreed to go to the police headquarters. After Detective Stroze informed Holmes of his Miranda[1] rights, Holmes agreed to speak to him. The unrecorded questioning started around 2:45 p.m. in a robbery interview room of the police headquarters, and during the interrogation, several breaks were taken.

While questioning Holmes, Detective Stroze received a phone call from another detective informing him that a pair of bloody size thirteen sneakers[2] were found at Holmes' residence during the execution of the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] The blood on the sneakers matched the victim's blood.

search warrant. When Detective Stroze returned to the interview room, he asked Holmes what size sneakers he had on. Holmes looked at the size, placed his thumb over the number thirteen size, and told him his sneakers were size twelve, which was the Canadian or European size. After Detective Stroze corrected Holmes, he told Detective Stroze that the sneakers he was wearing was his only pair.

Detective Stroze showed Holmes a photo of the victim's vehicle, and Holmes stated that he had never seen the vehicle. Detective Stroze then showed Holmes a photo of the victim, and he admitted that he knew her but had not seen her in about three weeks to a month. Holmes then informed Detective Stroze that his (Holmes) fingerprints would be all over the victim's car and home because he had been in both on numerous occasions.

Detective Stroze told Holmes that he believed that Holmes was involved in the homicide, informing Holmes about the evidence against him, including the fingerprints recovered from the victim's home. Holmes denied any involvement, but got very nervous. Around 7:15 p.m., Detective Stroze once again told Holmes about the evidence against him, and Holmes then stated that he discovered the victim deceased in her house, but immediately ran outside without reporting it. Detective Stroze told Holmes to stop lying.

4

Holmes then admitted that he stabbed the victim, explaining what occurred. Detective Stroze then took Holmes down the hall to a homicide interview room. Detective Stroze then asked Holmes if he would give a recorded statement. Holmes stated that he would not because he already gave Detective Stroze enough. Detective Strove also asked Holmes if he would give a stenographic statement, and Holmes refused. Without Holmes' knowledge, Detective Parr, who was in another room, activated the video recording device, and Detective Stroze began to review his notes with Holmes at approximately 9:00 p.m., which lasted about twenty minutes.

The transcript of the recording was introduced at the evidentiary hearing, which reflects the following statements by Holmes as to what occurred on May 10, 2005. Holmes stated that he knew the victim and went to her home to ask for money on the evening of May 10, 2005. The victim invited him into her home and offered him a beer. After a while, she asked him to help her move a dresser in the master bedroom. He then asked her for $20, and in response, she began to curse and told him that she was not going to give him any money. She slapped Holmes and told him that she was going to call the police, and Holmes got mad. He then went to the kitchen sink and retrieved a seven- to eight-inch knife and

carried it along his side to conceal it from the victim. At this point, they were in the living room area, and he pushed her into the hallway so no one could see her if they were looking through the windows. He grabbed and held her until she fell to the ground. He then stabbed her, but the knife did not go all the way in because she grabbed the knife for about twenty seconds in an attempt to stop him from pulling it out and stabbing her again. She cut her hand. When she was holding the knife, she said, "Derrick, you [are] the nicest guy on the street," which made Holmes feel like, "Damn. I wish I could bring this lady back." He removed the knife and stabbed her again. Holmes believes that the knife went all the way through because he saw blood "squirt out" from her back. At that point, Holmes believed that the victim was dead because "she went straight out," her head went back, her "[e]yes got --- went like that," and she didn't say anything.

After he stabbed the victim the second time, he put gloves on his hands, which gloves he had in his pockets when he arrived at the victim's home. He turned off the porch light and began to go through her house looking for items to steal, and during his search, he removed his gloves because he was having difficulty grabbing items. He found a change jar in

a drawer, but left it behind because he panicked.[3] He placed the stolen items in the victim's Toyota Camry and left driving the victim's Camry. He bought drugs with the money he made from selling the stolen items. He discarded the knife after he left the victim's house, and eventually abandoned the Camry[4] and walked home. He changed his clothes and placed his sneakers in his closet. After using the drugs, he panicked and left his house.

Following the recorded statement, Detectives Stroze and Parr drove Holmes to where he stated he discarded the knife, but the knife was not located. The detectives then transported Holmes back to the detention center around 1:12 a.m.

At the conclusion of the Motion to Suppress hearing, the trial court did not rule. Thereafter, Holmes filed a "Supplemental Memorandum to Exclude Videotaped Statement Following Evidentiary Hearing on Motion to Suppress." Holmes argued that during the interrogation, he stated, "I've given you enough already," which statement constituted the invocation of his right to remain silent and the questioning should have ceased at that point. Thereafter, the trial court heard legal argument as to whether

---

[3] The fingerprints on the change jar matched Holmes' fingerprints.

[4] The Camry was located where Holmes stated he abandoned the vehicle.

7

Holmes' statement during the interrogation constitutes an unequivocal assertion of his right to remain silent. At the conclusion of the hearing, the trial court denied the Motion to Suppress and the Supplemental Motion to Suppress, explaining in relevant part as follows:

> I think that while he did respond that he was not willing to give a recorded statement, he didn't indicate that he wanted to stop talking because it's clear from the transcript that the detective asked him to go over the notes and he agreed; he continued to engage him, so if he did not want to continue speaking, he – and he did – and he was trying to make a revocation of his previous waiver, it would have been clear and the question wouldn't be out there as to whether it was just in response to a question or if he was in fact making that statement.

At trial, the State called the associate medical examiner who testified as to the wounds on the victim's body. He testified that there were three stab wounds any of which could have caused death independently. One stab wound was to the left, top side of the chest, and it went through the victim's left lung, fractured the fourth rib, and pierced the wall of the chest on the back. Another wound was to the left, bottom side of the chest and it went through cartilage of the eighth rib. Further, the knife went into the abdominal cavity and injured the victim's kidney, liver, stomach, and pancreas. The other wound went through the victim's right lung. The victim also had defensive wounds on her left hand and fingers.

Detective Stroze also testified as to his interrogation of Holmes. He

testified that towards the end of his unrecorded interrogation of Holmes, he asked Holmes for a "formal recorded statement," which meant that he wanted to take a "stenographically recorded statement." Holmes declined and stated, "[Y]ou know what, I gave you too much already." Outside of the interrogation room, Detective Stroze and Detective Parr agreed that Detective Stroze would go back into the interrogation room and tell Holmes that he (Detective Stroze) wanted to review his notes with Holmes and, at that point, Detective Parr will hit the recording button. As planned, Detective Stroze entered the interrogation room and told Holmes that he wanted to go over his notes of what Holmes had stated earlier. Thereafter, Detective Stroze went over his notes and Holmes himself clarified several of Detective Stroze's notes. During Detective Stroze's testimony, over objection, the videotaped recording was played for the jury.

At the conclusion of the State's case, the Defendant moved for a judgment of acquittal. Following the defense's argument, the State nolle prossed Count II.

The Defendant did not call any witnesses, and the defense rested. The defense moved for a second judgment of acquittal, which the trial court denied.

The trial court asked defense counsel if he wanted a special

9

interrogatory verdict form separating the theories of first-degree murder. Defense counsel stated that he did not. The jury returned a verdict finding Holmes guilty of first-degree murder and while in the course of committing the first-degree murder, Holmes carried, used, displayed, or threatened to use a knife. Holmes was later sentenced to a term of life, and this appeal followed.

Holmes contends that the evidence was legally insufficient to support his conviction for first-degree premeditated murder because the State allegedly failed to establish beyond a reasonable doubt that the homicide was premeditated. Based on our de novo review, we disagree. See Pena v. State, 298 So. 3d 1224, 1227 (Fla. 3d DCA 2020) ("A motion for judgment of acquittal is reviewed de novo to determine whether the evidence is legally sufficient to support the jury's verdict.") (quoting Jefferson v. State, 243 So. 3d 1014, 1017 (Fla. 3d DCA 2018)).

When determining whether the evidence was legally sufficient, all evidence must be viewed in the light most favorable to the State. Pena, 298 So. 3d at 1227. Further, the evidence is legally sufficient when a rational trier of fact could have found that the elements of the crime existed beyond a reasonable doubt. See Bush v. State, 295 So. 3d 179, 200 (Fla. 2020). If there is substantial, competent evidence to support the jury's

10

verdict, the appellate court must affirm.  Id. at 200-01.

As to the element of premeditation for the offense of first-degree murder, the Florida Supreme Court explained the following:

> Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill.  Premeditation may be formed in a moment and need only exist for such a time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.

Morrison v. State, 818 So. 2d 432, 452 (Fla. 2002) (quotations and citations omitted).  In addition, "[e]vidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted."  Sochor v. State, 619 So. 2d 285, 288 (Fla. 1993) (quoting Larry v. State, 104 So. 2d 352, 354 (Fla. 1958)).

In the instant case, without rehashing Holmes' statement made during the videotaped interview, which was played for the jury, the State established beyond a reasonable doubt that the homicide was premeditated and there was substantial, competent evidence to support the jury's verdict as to first-degree murder.  Holmes' statement reflects that he had "a fully formed conscious purpose to kill."  Morrison v. State, 818 So. 2d at 452.  We disagree with Holmes' characterization of what occurred as

11

a "spur-of-the-moment act." After he became mad at the victim, he walked over to the kitchen sink, grabbed the knife from the sink, and held it to his side to hide it from the victim. He then pushed her into the hallway to avoid detection, and then held her until she fell to the floor. After she fell to the ground, he stabbed her for the first time. She struggled with Holmes for about twenty seconds because she did not want him to pull the knife out so that he could stab her again. Although having twenty seconds to contemplate his next action, he opted to pull out the knife and stab her again with enough force that the knife exited her back. Moreover, the assistant medical examiner's testimony reflects that the victim was actually stabbed three times, and that any of the stab wounds could have independently caused death. Clearly, Holmes' actions indicate that he acted with premeditation. See Jackson v. State, 180 So. 3d 938, 956 (Fla. 2015) ("When a victim is deliberately stabbed with a knife several times in vital organs, as occurred here, the manner of death can provide circumstantial evidence of premeditation."); Morrison, 818 So. 2d at 452 (concluding that premeditation established where the victim suffered two major knife wounds to the neck, and the second was sufficiently deep to nick the victim's vertebrae). Accordingly, we conclude that the State established beyond a reasonable doubt that Holmes committed the murder

12

with premeditation.[5]

Next, Holmes contends the trial court erred by failing to suppress the recorded statement with Detective Stroze, arguing that he unequivocally invoked his right to remain silent by stating, "[Y]ou know what, I gave you too much already," when Detective Stroze asked Holmes if he could stenographically record his statement when going over his notes with Holmes. Based on the circumstances of this case, we disagree. See State v. Socarras, 272 So. 3d 488, 491 (Fla. 3d DCA 2019) (quoting Ross v. State, 45 So. 3d 403, 414 (Fla. 2010)) ("We defer to a trial court's findings of fact as long as they are supported by competent, substantial evidence, but we review de novo a trial court's application of the law to the historical facts.").

In the instant case, Holmes waived his Miranda rights and freely spoke with Detective Stroze. However, once waived, Holmes had the right to "reassert his right of silence at any time, even in the midst of a police interrogation, and bring a halt to the questioning." Horne v. State, 127 So. 3d 898, 902 (Fla. 5th DCA 2013). The Florida Supreme Court has

---

[5] Holmes also argued that the State failed to establish felony murder and that the motion for judgment of acquittal should have been granted as to the lesser-included offense of second-degree murder. We need not reach these arguments based on our conclusion as to first-degree premeditated murder.

explained:

> It is well established that where a defendant has received proper <u>Miranda</u> warnings and waived his <u>Miranda</u> rights, he must make an unequivocal or unambiguous request to terminate an interrogation in order to reassert those rights. If a defendant's attempt to revoke his waiver is ambiguous or equivocal, police are not required to either cease questioning or to clarify whether the defendant's statement was in fact a reassertion of his <u>Miranda</u> rights. <u>Id.</u> A revocation is unambiguous if a reasonable police officer under the circumstances would understand that the suspect is invoking the right. When determining whether a revocation is unambiguous, we consider whether the response refers to specific questions about the crime or about the underlying right to cut off all questioning.

<u>Braddy v. State</u>, 111 So. 3d 810, 830 (Fla. 2012) (quotation marks and citations omitted). Further,

> [a] suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation.

<u>State v. Owen</u>, 696 So. 2d 715, 718 (Fla. 1997).

In support of his position, Holmes relies on <u>Johnson v. State</u>, 135 So. 3d 1002 (Fla. 2014). During Johnson's interrogation the following transpired:

JOHNSON:  I don't want to say no more.

DETECTIVE FLAHERTY:  You sure?

14

JOHNSON:  Yes.

DETECTIVE FLAHERTY:  If you're sure, that's your right.

JOHNSON:  Can I have a cigarette, please?

DETECTIVE FLAHERTY:  I don't have cigarettes here.  We'll see if I can get one for you.

JOHNSON:  I know I did not pull a knife on her.

Id. at 1032.  On appeal, Johnson argued that Detective Flaherty failed to scrupulously honor his termination of the interview.  The Florida Supreme Court disagreed with Johnson's contention.  Although finding that Johnson's statement—"I don't want to say no more"—was an unequivocal invocation of his right to remain silent, the Court concluded that Detective Flaherty honored Johnson's invocation of his right to remain silent.  Id. at 1032.

Johnson is distinguishable from the instant case.  Unlike Johnson, Holmes' statement was not an unequivocal invocation of his right to remain silent.  Rather, Holmes' statement was made in response to Detective Stroze's question if he could record Holmes while going over his notes with Holmes.  Despite stating that he did not want to be recorded, Holmes did not unequivocally invoke his right to remain silent.

Holmes' reliance on Dixon v. State, 72 So. 3d 171 (Fla. 4th DCA 2011), is also misplaced.  Dixon appealed his convictions for armed

15

burglary of a dwelling, burglary of a dwelling, grand theft with a firearm, and grand theft, which charges stem from two incidents at his parents' home. Id. at 172. Dixon argued on appeal that after he waived his Miranda rights, he made several unequivocal and unambiguous statements invoking his right to remain silent. The Fourth District Court Appeal agreed with Dixon's argument, stating as follows:

> The circumstances of this case demonstrate that the defendant unequivocally invoked his right to remain silent on the issue of the home burglaries. In response to questions about the burglaries, Dixon said: "I don't want to talk about that"; "[T]his conversation here about this house thing is through, I don't wanna talk about that, period"; "I don't want anything to do with this here what you talking about what did I do. . . . I don't want to go through that"; "Yeah, I ain't talking about that there"; "Now enough is enough, you know what I'm saying, enough is enough. Now, I don't want to talk about that house no more"; "Let's not talk about the house"; and "I don't want to talk about it no more".

Id. at 176 (citations omitted).

Dixon is distinguishable from the instant case. As already stated, Holmes' statement was not an unequivocal and unambiguous invocation of his right to remain silent. Rather, Holmes' statement was made in response to Detective Stroze's question if he could record Holmes while going over his notes with Holmes. See Van Royal v. State, 497 So. 2d 625, 627 (Fla. 1986) (finding that Van Royal declining to give a taped statement after waiving Miranda was not an exercise of his right to remain

16

silent).    Thus, we conclude that Holmes did not unequivocally and unambiguously invoke his right to remain silent under the circumstances.

For the above stated reasons, we affirm Holmes' conviction and sentence for first-degree murder.

Affirmed.